EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
      Plaintiff,

      v.

DAY & ZIMMERMAN NPS, INC.,
      Defendant.

No. 15-cv-1416 (VAB)

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

The Equal Employment Opportunity Commission (the "Commission" or "EEOC" or "Plaintiff") brought this action against Day and Zimmerman NPS, Inc. ("DZNPS" or "Defendant") under Title V of the Americans with Disabilities Act of 1990 (the "ADA"). ECF No. 1.

In October of 2012, Gregory Marsh filed a charge with the EEOC, alleging that DZNPS had violated the ADA. In March of 2014, as part of its investigation of Mr. Marsh's allegations, the EEOC sought information from DZNPS, including the names and contact information of other DZNPS employees. In June of 2014, before DZNPS provided the requested information to the EEOC, DZNPS sent a letter to approximately 146 DZNPS employees. This letter, among other things, identified Mr. Marsh by name and noted that he had filed a discrimination disability charge with the EEOC. The EEOC alleges that, by sending the letter, DZNPS (1) retaliated against Mr. Marsh for filing a charge with the EEOC in violation of the ADA and (2) interfered with Mr. Marsh's and the Letter recipients' exercise and enjoyment of rights protected by the ADA.

The EEOC has filed a motion for partial summary judgment on its interference claim under the ADA. ECF No. 69. DZNPS has filed a motion for summary judgment as to the Complaint in its entirety, arguing that (1) the EEOC's legal theories would violate DZNPS's free speech rights under the First Amendment of the United States Constitution; (2) that the June 2014 letter is protected by the litigation privilege under Connecticut law; (3) that the EEOC cannot, as a matter of law, make out a claim for retaliation under the ADA; (4) that the EEOC cannot, as a matter of law, make out a claim for interference under the ADA; and (5) that the EEOC lacks standing to bring this case under Article III of the United States Constitution. ECF No. 73.

For the reasons that follow, the Court **DENIES** the EEOC's motion for partial summary judgment, ECF No. 69, and also **DENIES** DZNPS's motion for summary judgment, ECF No. 73.

## I.     FACTUAL BACKGROUND

DZNPS is a maintenance and modification company that provides unionized, craft labor to its clients in the power industry[1]. Pl.'s 56(a)(1) ¶ 1, ECF No. 71.

DZNPS has written anti-discrimination and anti-retaliation policies that apply to corporate employees, permanent craft workers, and temporary craft workers. Def.'s 56(a)(1) ¶ 9, ECF No. 75. These policies prohibit reprisal or retaliation against DZNPS employees that report violations of any policy, including non-discrimination and non-harassment policies, or who are "involved in an investigation of discrimination." Cooney Dep. 174:17-174:21, Def.'s 56(a)(1) Ex. B, ECF No. 75-1.

---

[1] Because the primary dispute between the parties concerns legal questions rather than factual ones, there are few disputed facts in this case.

DZNPS maintains a policy to provide reasonable accommodations to qualified employees or job applicants that have disabilities. Def.'s 56(a)(1) ¶ 12. DZNPS also has a policy that medical information that DZNPS obtains in connection with the reasonable accommodation process will be kept confidential, including by being kept in files separate from an employee's personnel file. *Id.* ¶ 13. The policy does allow DZNPS to share the information with an employee's supervisor or foreman, as needed to make appropriate determinations regarding a reasonable accommodation request. *Id.*

Dominion Power, which operates the Millstone nuclear power station ("Millstone"), located in Waterford, Connecticut, is one of DZNPS's clients. Pl.'s Rule 56(a)(1) ¶ 2. DZNPS provides both long-term and temporary workers to Millstone. *Id.* ¶ 3. Approximately twice a year, Millstone's nuclear reactors are shut down for scheduled maintenance for around one month to several weeks. *Id.* ¶ 5. During these temporary outages, DZNPS hires additional labor through union hiring halls, to assist with the work at Millstone during the shutdown. *Id.* ¶ 6. During each shutdown, DZNPS employs as many as 600 temporary craft workers, including electricians, pipe fitters, welders, boilermakers, and carpenters. *Id.* ¶ 7.

Once the Millstone shutdown is over and the maintenance work is complete, DZNPS generally lays off the temporary craft workers, though the same temporary workers are often re-hired for subsequent Millstone outages. Pl.'s 56(a)(1) ¶ 9. DZNPS begins laying off temporary workers as the outage winds down[2]. *Id.* ¶ 11.

Whenever DZNPS needs to hire electricians to work at Millstone, it typically contacts the International Brotherhood of Electrical Workers ("IBEW") Local 90 hiring hall. Pl.'s 56(a)(1) ¶

---

[2] While DZNPS does not dispute this fact, it argues that the EEOC's citation, to the deposition of Richard Intravia, is not a citation to the testimony of a competent witness as Mr. Intravia is not an "agent or manager of DZNPS." Def.'s 56(a)(2) ¶ 11, ECF No. 86. DZNPS objects to several other facts in the Plaintiff's Rule 56(a)(1) Statement on these grounds. *See id.* ¶¶ 9, 11.

9.  If and when IBEW Local 90 does not have enough electricians to meet demand, electricians from other locals, including IBEW Local 35, are referred to DZNPS to fill remaining need.  *Id.* Union members cannot solicit work directly with DZNPS; they must instead rely on the referral system through their union to obtain work.  *Id.*  Under the agreement between DZNPS and Local 90, DZNPS may reject any referred worker without providing a reason for the rejection.  *Id.*

### A.     Events in Fall of 2012

In or around the fall of 2012, during a Millstone outage, DZNPS hired roughly 150 temporary electricians, a typical number for a shutdown.  Pl.'s 56(a)(1) ¶ 8.  For the fall 2012 outage, IBEW Local 90 referred Mr. Marsh, an electrician and member of IBEW Local 35, to work at Millstone[3].  *Id.* ¶ 12.  Mr. Marsh is licensed as an electrician by both the State of Connecticut and the Commonwealth of Massachusetts.  Def.'s 56(a)(1) ¶ 18.  Mr. Marsh accepted the assignment.  Pl.'s 56(a)(1) ¶ 12.  Mr. Marsh then reported to work for DZNPS at Millstone.  *Id.* ¶ 14. For the fall 2012 Millstone outage, DZNPS also hired 146 other electricians. Def.'s 56(a)(1) ¶ 28.

After Mr. Marsh began training for the fall 2012 position at Millstone, he provided a doctor's note to a DZNPS representative.  Pl.'s 56(a)(1) ¶ 14.  That DZNPS representative was Tom Keith.  Def.'s 56(a)(1) ¶ 29.  The doctor's note indicated that Mr. Marsh could not work around radiation.  Pl.'s 56(a)(1) ¶ 14.  Specifically, the note was from Northeastern Pulmonary Associates, and it stated that "[d]ue to lung disease," Mr. Marsh "should not be around radiation, chemicals[,] or exposure."  Def.'s 56(a)(1) ¶ 30.  The note requested a reasonable accommodation for Mr. Marsh.  Pl.'s 56(a)(1) ¶ 14.

---

[3] Historically, Mr. Marsh received approximately 80% of his referrals for work from Local 35, and the other 20% of his referrals from other locals, including Local 90.  Pl.'s 56(a)(1) ¶ 13.

After receiving the doctor's note and the request for a reasonable accommodation, Mr. Keith terminated Mr. Marsh's employment at Millstone.  Pl.'s 56(a)(1) ¶ 14.

## B.  EEOC Charge and Investigation

On or around October 23, 2012, Mr. Marsh filed a charge of discrimination with the EEOC, alleging that DZNPS had discriminated against him on the basis of his disability.  Pl.'s 56(a)(1) ¶ 15.  DZNPS believed that the EEOC's investigation of Mr. Marsh's charge was an adverse proceeding against DZNPS[4].  *Id.* ¶ 19.  DZNPS also denied any allegation that it discriminated against Mr. Marsh.  Def.'s 56(a)(1) ¶ 34.

Mr. Marsh's charge specifically stated that, on September 28, 2012, he had gone to his doctor who wrote the note indicating that Mr. Marsh could not work in an area that had radiation, chemicals, or exposure.  *See* EEOC Charge at 1, Def.'s 56(a)(1) Ex. N, ECF No. 75-2.  His charge indicated that when he had given the doctor's note to Mr. Keith, Mr. Keith said that DZNPS could not accommodate Mr. Marsh, and that Mr. Keith then terminated Mr. Marsh.  *Id.* Mr. Marsh's charge then stated that he believed that he was discriminated against because of his disability.  *Id.* at 2.  Specifically, Mr. Marsh alleged that "90% of [Millstone] does not even have radiation and [he] could still work in an different area of the job without radiation," "[i]nstead [he] was terminated."  *Id.*

On March 4, 2014, as part of its investigation, the EEOC requested a list of all individuals that DZNPS employed as electricians at Millstone during the fall 2012 outage, including each individual's name, job title, dates of employment, last known home address, and

---

[4] The EEOC disputes the characterization of an EEOC investigation as an adversary proceeding, but courts in this Circuit have found that an EEOC investigation is an adversary proceeding.  *See Tsai v. Rockefeller Univ.*, 137 F. Supp. 2d 276, 282-83 (S.D.N.Y. 2001) (noting that "[f]iling an EEOC charge is an adversarial proceeding that forces a complainant to relive the memories of the alleged  discriminatory treatment" in context of finding that equitable tolling was warranted due to plaintiff's physical and mental health conditions).

last known telephone number.  Pl.'s 56(a)(1) ¶ 16.  DZNPS initially did not want to provide this list of contact information.  *Id.* ¶ 17.  Instead, DZNPS initially suggested that the EEOC investigator should interview Richard Bohan, who had been an employee of DZNPS for over 20 years, and who had worked as a foreman during the fall 2012 shutdown at Millstone.  *Id.* DZNPS argued that the EEOC made the request for all of the electricians' contact information to "engag[e] in a fishing expedition."  *Id.* ¶ 18.

On June 19, 2014, DZNPS provided the EEOC with the employee contact information that the EEOC had requested on March 4, 2014.  Pl.'s 56(a)(1) ¶ 31.  The EEOC ultimately spoke to four of the individuals that DZNPS identified.  *Id.* ¶ 32.

### C.     DZNPS's June 2014 Letter

In June 2014, DZNPS sent a letter discussing Mr. Marsh's EEOC charge to the current and former electricians that had worked at Millstone during the fall 2012 outage (the "Letter"). Pl.'s 56(a)(1) ¶ 20.  The Letter was sent to the other 146 electricians that had been hired for the fall 2012 Millstone shutdown in addition to Mr. Marsh.  Def.'s 56(a)(1) ¶ 41.  The Letter's recipients were members of IBEW Local 90 and Local 35.  Pl.'s 56(a)(1) ¶ 20.  Some of the recipients were foremen, or held other supervisory roles on union jobs.  *Id.*  The Letter was on DZNPS letterhead, and it was signed by Lisa Anne Cooney, the Senior Labor and Employment Counsel for DZNPS.  *Id.* ¶ 21.

Before DZNPS sent the Letter, Ms. Cooney sent a draft of the letter to the business agent for IBEW Local 90.  Def.'s 56(a)(1) ¶ 50.  The business agent is the most senior management person for the Local.  *Id.* ¶ 52.  The business agent for IBEW Local 90 consented to DZNPS sending out the Letter before DZNPS sent it.  *Id.* ¶ 53.  Ms. Cooney testified that, had the

business agent not consented, she would not have sent out the letter. *See* Pl.'s 56(a)(1) ¶ 53,

ECF No. 88 (admitting that Ms. Cooney so testified while denying this is a material fact).

The Letter stated, in relevant part, that:

The [EEOC] has required [DZNPS] to provide a list of all electricians employed by DZNPS at [Millstone] during the Fall 2012 outage. The EEOC is specifically seeking each electrician's name, job title, dates of employment, last known home address[,] and last known telephone number . . . .

The EEOC sought this information to investigate a charge of disability discrimination filed by Gregory Marsh. Mr. Marsh, a member of the [IBEW Local 35], was one of several electricians referred by his Union for hire during the Fall 2012 outage at Millstone. In his charge, Mr. Marsh alleges that his doctor told him he could not work in an area that had radiation, or be around radiation, chemicals or exposure. He further alleges that DZNPS failed to accommodate this disability because 90% of the Millstone plant, he claims, does not have radiation, and that he could have worked in an area without radiation, chemical or exposure. DZNPS denies the allegations made by Mr. Marsh, and specifically denies any wrongdoing or discrimination.

As part of the EEOC process, an investigator has been assigned to evaluate the merits of Mr. Marsh's allegations. It is our understanding that the investigator may contact you to inquire into your job responsibilities during the Fall 2012 outage. It is your decision whether you wish to speak with the investigator and your decision will not have an adverse impact on your current or future employment with DZNPS. DZNPS is committed to providing equal employment opportunities to all employees and applicants for employment without regard to race, color, religion, sex, national origin, age, disability, sexual orientation[,] or other status protected by applicable federal, state, or local law. DZNPS also prohibits any form of retaliation against an employee, including those who chose to participate in the EEOC investigation.

If you choose to speak with the EEOC investigator and would like to have a counsel for DZNPS present while you speak to the investigator, please let us know and we will make the necessary arrangements.

Letter at 1, ECF No. 72-9. The letter goes on to provide the contact information for DZNPS's

counsel at Littler Mendelson. *Id.* The Letter omits any reference to Mr. Marsh's specific

medical condition of lung disease. Def.'s 56(a)(1) ¶ 46. At the time Ms. Cooney sent the letter,

she knew that the EEOC was still in the process of investigating Mr. Marsh's charge. Cooney

Dep. 27:8-14, ECF No. 72-1. Four recipients of the Letter contacted DZNPS in response to the Letter. Pl.'s Rule 56(a)(1) ¶ 33.

Ms. Cooney helps shape equal employment opportunity and human resources policies at DZNPS. Pl.'s 56(a)(1) ¶ 22. Ms. Cooney also manages DZNPS's outside litigation relating to labor and employment. *Id.*

### D. DZNPS Motivations for Sending Letter

With respect to the sending of the Letter, Ms. Cooney has testified that it was a "standard courtesy notice," and that her usual practice, as with many other lawyers, is that "when there's an adverse proceeding and there's witnesses who also happen to be employees," to notify those employees to let them know that someone from the government might want to interview them and possibly take their deposition. Cooney Dep. 25:13-22, ECF No. 72-1. Ms. Cooney further testified that such standard notices should let employees know that the employer has given out the employees' contact information and that the employees can expect a phone call. *Id.* 25:22-25. She testified that communicating by letter is a better alternative than making "a lot of phone calls" to every affected employee. *Id.* 26:1-7.

As to DZNPS's motive for sending the Letter, Ms. Cooney has also testified that the Letter was also intended to respond to "questions that [she had] received over the years in situations like this," such as whether employees need to cooperate and how DZNPS would not retaliate against employees who did cooperate, that employees could contact the "ethic[s] hotline" if they felt retaliated against in connection with cooperating with the investigation, and so on. Cooney Dep. 45:1-46:1, ECF No. 72-1. She therefore testifies that the "[L]etter really answers questions that [she had] received over the years." *Id.* 46:1-3. Her testimony also mentions other employee questions and concerns that she had received in the past and that were

not addressed in the Letter, including "can I get paid," "[t]his is on company time," and "[i]s the company paying for my lawyer." *Id.* 46:3-10.

Ms. Cooney has also testified that part of the purpose for sending out the Letter and similar notices is to find out "what the witnesses have knowledge about," regarding the EEOC charge. Cooney Dep. 54:13-20, ECF No. 72-1. She also testified that she "had no reason to believe" that all the Letter recipients "knew anything about the case. *Id.* 165:1-8. She further agreed that DZNPS did not think it had a "legal obligation to inform he witnesses that it had provided their contact information to the EEOC." *Id.* 47:1-5. She also agreed that not every potential witness necessarily needs to know the identity of the individual that filed the EEOC charge. *Id.* 165:1-6.

DZNPS maintains a policy that medical information that DZNPS obtains in connection with the reasonable accommodation process for disabled employees will be kept confidential. Def.'s 56(a)(1) ¶ 13. Ms. Cooney has testified, however, that after an employee files a charge with the EEOC, the resulting process is "very different than an employee engaging interactively with their employer" in the reasonable accommodation process. Cooney Dep. 186:9-20, ECF No. 75-1. Ms. Cooney has also testified that, in her view, when there is an EEOC investigation, DZNPS needs to "do a fact investigation," and the employee filing the charge has "put the disability and/or the denial of the accommodation at issue in the claim." *Id.* 186:14-20.

### E.    Events after June 2014.

After DZNPS sent out the Letter, Mr. Marsh testified that he was approached by a few other individuals regarding the letter or its contents. Def.'s 56(a)(1) ¶¶ 69-77. Specifically, Mr. Marsh was approached by two of the Letter recipients, Dan Petit and Henry Calderon, who discussed the letter's contents, including the fact that Mr. Marsh had alleged disability

discrimination against DZNPS. *Id.* ¶¶ 69-70. Mr. Marsh also testified that he spoke to a Mike Stebbins, a member of Local 35 who had not received the Letter, and that Mr. Stebbins told Mr. Marsh, "I heard you sue everybody." *Id.* ¶¶ 71-74. Mr. Stebbins did not tell Mr. Marsh how he had learned about Mr. Marsh's EEOC charge. *Id.* ¶ 74.

Mr. Marsh has also testified that, since the Letter was sent, he has received the same number of referrals for work from the union hiring halls. Def.'s 56(a)(1) ¶ 78. He also testifies, however, that he is now being laid off from every job first. *Id.* Mr. Marsh has testified that he believes that part of the reason for his now being one of the first workers to be laid off from each job is that DZNPS wrote to the National Electrical Contractors Association about this litigation. Pl.'s 56(a)(2) ¶ 79.

Mr. Marsh further testifies that, since the Letter was sent, DZNPS had posted for jobs with Mr. Marsh's union locals, but that Mr. Marsh was not referred for these jobs, even though he "signed" to request the job before at least one other person who got the job[5]. Marsh Dep. 92:6-93:23, Def.'s 56(a)(1) Ex. H, ECF No. 75-1. Mr. Marsh testified that he "assumed [DZNPS] didn't want me," though he admits that he can only "guess" as to the reason. *Id.* 93:23-94:19.

As part of the investigation of Mr. Marsh's charge with EEOC, and as of the date that DZNPS filed its motion for summary judgment, the EEOC has interviewed four of the Letter recipients[6]. Pl.'s 56(a)(2) ¶ 85. These individuals are Richard Bohan, Ray Pierson, Phillip Michaud, and Mike Stawecki. *Id.*

---

[5] The EEOC disputes this fact, but it is supported by Mr. Marsh's deposition testimony. *See* Pl.'s 56(a)(2) ¶¶ 81-82.

[6] The EEOC denies that these are material facts for the purposes of summary judgment and further "objects to the extent that this statement is misleading," but without a citation to the record. Pl.'s 56(a)(2) ¶¶ 85-119. Failure to include a citation to the record violates Local Rule 56. *See* Local R. Civ. P. 56(a)(3) ("[E]ach denial in a[] [summary judgment] opponent's Local Rule 56(a)(2) Statement, must be followed by a specific citation to (a) the

### F.     EEOC Publicity for this Case

The EEOC issued a press release regarding this case on September 28, 2015, the day it filed the Complaint.  Def.'s 56(a)(1) ¶ 120.  The press release described the general nature of the case.  *Id.* ¶ 121.  The EEOC also published an update regarding this case to the EEOC's Twitter feed, which had roughly 9,000 followers.  *Id.* ¶¶ 122-23.  EEOC press releases about new cases often disclose the name of the complainant and the nature of their charge, including that a certain charge arises from a disability or medical condition, if applicable, though the press releases generally do not disclose the specific medical condition at issue.  *Id.* ¶¶ 130-137.

## II.     STANDARD OF REVIEW

The Court will grant a motion for summary judgment if it determines that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that no genuine dispute of material fact exists.  *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000).  Once the moving party has satisfied that burden, the nonmoving party "must set forth specific facts demonstrating that there is a genuine issue for trial" in order to defeat the motion for summary judgment.  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks omitted).

"A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. Of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. Am. Cyanamic Co.*, 158 F.3d 622, 626 (2d Cir. 1998)). The substantive law governing the case identifies which facts are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will

---

affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial.").

properly preclude the entry of summary judgment." *Boubolis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On summary judgment, the Court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). When reviewing the record on a motion for summary judgment, the Court must "assess the record in the light most favorable to the non-movant" and "draw all reasonable inferences in the non-movant's favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (internal quotation marks omitted).

Inferences drawn in favor of the nonmovant must, however, be supported by evidence, and the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" is insufficient to defeat summary judgment. *Liberty Lobby*, 477 U.S. at 252. "Conclusory allegations, conjecture, and speculation" are insufficient to create genuine issues of material fact. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (internal quotation marks omitted). If no reasonable jury "could find in favor of the [nonmovant] because the evidence to support its case is so slight, there is no genuine issue of material fact," then a grant of summary judgment is proper. *Gallo*, 22 F.3d at 1224.

## III.    DISCUSSION

Both the EEOC, ECF No. 69, and DZNPS, ECF No. 73, move for summary judgment. The EEOC requests that the Court find that there is no dispute of material fact regarding DZNPS's Letter being interference in violation of the ADA. DZNPS move for summary judgment on the EEOC's Complaint in its entirety, arguing that there is no dispute of material fact that its sending the Letter is not either retaliation or interference in violation of the ADA.

DZNPS further argues that the EEOC lacks Article III standing to bring this case because, in DZNPS's view, no punitive or compensatory damages are available. Def.'s Br. at 32-34, ECF No. 74. DZNPS also argues that any finding that the Letter violated the ADA would unlawfully infringe on DZNPS's rights to freedom of speech under the First Amendment. *Id.* at 10-15. DZNPS also argues that the sending of the Letter is protected by the litigation privilege under Connecticut Law.

For the reasons that follow, the Court finds that neither the EEOC nor DZNPS are entitled to summary judgment. Both of the EEOC's ADA claims for retaliation and interference will proceed to trial.

## A. Threshold Questions

### 1. Standing

DZNPS claims that the EEOC lacks Article III standing to bring this case because no punitive or compensatory damages are available to the EEOC. Def.'s Br. at 32-34. The EEOC disputes DZNPS's argument as to the availability of punitive or compensatory damages, but argues that the EEOC has standing, regardless of whether such damages are available, and that the Court need not, therefore, address the availability of punitive or compensatory damages at this stage of the case. Pl.'s Opp. at 32-38, ECF No. 97

Because the issue of standing affects this Court's authority to exercise jurisdiction over this appeal, the Court addresses standing before the other potential grounds for summary judgment. As federal courts are courts of limited jurisdiction, if the EEOC does not have standing to bring the Complaint, this Court has no authority to consider the "subsequent merits of" the EEOC's claims. *McCrory v. Adm'r of Fed. Emergency Mgmt. Agency of U.S. Dep't of Homeland Sec.*, 600 Fed. Appx. 807, 808 (2d Cir. 2015) ("As a threshold inquiry, a federal court

must determine that the plaintiff has constitutional Article III standing prior to determining issues of . . . the subsequent merits of the case.") (summary order); *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975) (explaining that constitutional standing "is the threshold question in every federal case, determining the power of the court to entertain the suit"); *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 89 n. 6 (2d Cir. 2006) ("Although lack of Article III standing and subject matter jurisdiction are distinct concepts, Article III standing remains . . . a limitation on the authority of a federal court to exercise jurisdiction." (internal citations omitted)). "A district court properly dismisses an action . . . for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when . . . the plaintiff lacks constitutional standing to bring the action*." Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.A.R.L.*, 790 F.3d 411, 416-17 (2d Cir. 2015) (internal quotation marks omitted).

Under the Case or Controversy Clause of Article III of the United States Constitution, in order for federal courts to have "subject matter jurisdiction," the "parties must continue to have a personal stake in the outcome of the lawsuit" at every stage of the case. *United States v. Wiltshire*, 772 F.3d 976, 978 (2d Cir. 2014). "Jurisdiction will not lie where the alleged injury is too speculative to satisfy the case-or-controversy requirement of Article III." *Id.* (internal quotation marks omitted).

The EEOC has standing to pursue this action. Through the ADA, Congress has charged the EEOC with the function of "prevent[ing] any person from engaging in any unlawful employment practice" that violates the ADA. 42 U.S.C. § 2000e-5(a) (providing in Title VII context that"[t]he Commission is empowered, as hereinafter provided, to prevent any person from engaging in any unlawful employment practice as set forth in" Title VII); *see also* 42

U.S.C. § 12117(a) (incorporating in ADA that "[t]he powers, remedies, and procedures set forth in [Title VII including section 2000e-5] shall be the powers, remedies, and procedures this subchapter provides to the Commission").  The ADA incorporates by reference the remedies available in Title VII, allowing the Court to, where appropriate, grant injunctive relief.  *See* 42 U.S.C. § 2000e-5(g)(1) ("If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate."); *see also* 42 U.S.C. § 12117(a) (incorporating remedies from Title VII to the ADA).

Furthermore, where Congress enacts a statute that "define[s] an injury in fact to the United States," and the statute shows that "Congress [has] determined that such conduct is harmful and should be prohibited," then "a violation of that statute inherently constitutes an injury to the United States."  *Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1325 (Fed. Cir. 2010) (noting that "[t]he parties have not cited any case in which the government has been denied standing to enforce its own law") (discussing *qui tam* action concerning patent infringement).  "It is beyond doubt" that a complaint "asserts an injury to the United States" if it alleges an "injury to its sovereignty arising from violation of its laws."  *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (discussing *qui tam* action under False Claims Act).

DZNPS cites to no legal authority supporting the proposition that, even if punitive or compensatory damages were not available to the EEOC in this case, an issue that the Court does not today address, then the alleged injury would not satisfy the case or controversy requirement of Article III.  *See* Def.'s Br. at 32 (citing *Wiltshire*, 772 F.3d at 978 (discussing case concerning

revocation of supervised release)). Additionally, courts have found that, even in situations where the employee has already entered into a settlement with the employer concerning the underlying charge that the employee filed with the EEOC, the EEOC will have standing to bring a claim for injunctive relief. *See E.E.O.C. v. Bay Ridge Toyota, Inc.*, 327 F. Supp. 2d 167, 173-74 (E.D.N.Y. 2004) ("EEOC's complaint seeks only injunctive relief. Settled law plainly demonstrates that EEOC's unique role in vindicating the public interest makes this type of suit for injunctive relief acceptable, even where the employee has entered into a settlement with the employer.") (discussing Title VII) (gathering cases). Because the EEOC has standing to enforce the ADA, even in the absence of potential monetary relief, the Court finds that the EEOC has standing to bring this case.

### 2. First Amendment

DZNPS also argues that, if the Court should find that its sending of the Letter was either retaliation or interference in violation of the ADA, then the Court would be establishing a content and speaker-based restriction on speech that violates the First Amendment. Def.'s Br. at 10-17. DZNPS argues that any finding that it is liable under the ADA for sending the Letter would be "content-based" because the finding is based on the specific content of the Letter, and that it would also be "speaker-based" because liability arises in part from DZNPS's status as an employer. *Id.* at 11. Meanwhile, DZNPS argues that the EEOC sometimes publishes similar information, i.e. the name of a charging party and the nature of the discrimination allegation, to the public. *Id.* at 12. The Court disagrees with DZNPS's First Amendment argument.

### a. Applicability of Strict Scrutiny Test

DZNPS cites cases inapposite to this one. The Second Circuit's ruling in *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 871 (2d Cir. 2008), *as modified* (Mar. 26, 2009), which discussed a

provision of the Patriot Act that prohibited communications services providers from disclosing that they had received a request from the FBI for information about one of their subscribers, applied the legal standard relevant to "prior restraint[s]" on expression, "the most serious and the least tolerable infringement on First Amendment rights," which "come[] to a court with a heavy presumption against its constitutional validity." *Doe*, 549 F.3d at 871 (internal quotation marks omitted). "[C]ontent-based" restrictions are also "subject to review under the standard of strict scrutiny," requiring that the restriction be "narrowly tailored to promote a compelling Government interest." *Id.* (internal quotation marks omitted).

DZNPS also cites to *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), in which the Supreme Court found that a Vermont state statute that prohibited, in the absence of consent by the prescribing physician,  (a) the sale of pharmacy records that described the prescribing habits of individual doctors to pharmaceutical companies for their use in marketing prescription drugs and (b) the pharmaceutical companies' use of such prescriber data to market prescription drugs. The Court found that "[b]oth on its face and in its practical operation," the statute "impose[d] a burden based on the content of speech and the identity of the speaker," *Id.* at 567, which required the state to show that the statute's "targeted, content-based burden" passed strict scrutiny and "directly advance[d] a substantial governmental interest and . . . [was] drawn to achieve that interest." *Id.* at 572.  Because the statute gave "possessors of the information broad discretion and wide latitude in disclosing the information, while at the same time restricting the information's use by some speakers and for some purposes, even while the State itself c[ould] use the information to counter the speech it seeks to suppress," the unequal burdening of only some forms of speech and some viewpoints or use of that speech by that statute was impermissible under the First Amendment. *Id.* at 580.

DZNPS, however, points to no authority supporting its argument that the First Amendment analysis discussed above applies to protect speech from a defendant if that speech gives rise to liability under the ADA or other employment discrimination statutes.  Employment discrimination statutes, in prohibiting discrimination against employees in protected classes, sometimes prohibit conduct that involves speech, such as "discriminatory intimidation, ridicule, and insult," in a workplace environment that "is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (discussing hostile work environment claims under Title VII) (internal quotation marks omitted).  DZNPS points to no authority suggesting that the First Amendment protects employers from this type of liability.  *See also Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (noting in dicta that the Supreme Court had "cited Title VII . . . as an example of a permissible content-neutral regulation of conduct"); *see also Baty v. Willamette Indus., Inc.*, No. 96-2181-JWL, 1997 WL 292123, at *7 (D. Kan. May 1, 1997) ("[S]imilar to blackmail or threats of violence, discriminatory conduct in the form of a hostile work environment are not protected speech; the regulation of discriminatory speech in the workplace constitutes nothing more than a time, place, and manner regulation of speech, which does not offend constitutional principles; the victims of workplace discrimination are captive audiences and the free speech guarantee permits great latitude in protecting captive audiences; if the speech at issue is treated as fully protected, the government's compelling interest in eradicating discrimination in the workplace permits such regulation; other First Amendment rights, such as the Freedom of Association, have bowed to narrowly tailored remedies designed to advance the government's compelling interest in eradicating discrimination in the workplace . . . as long as it has been determined that a harm has been and continues to be inflicted on identifiable

individuals and the context of the speech is the heart of the cause of action, the First Amendment has not been violated").

Furthermore, although an "employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the [National Labor Relations] Board," the Supreme Court has nonetheless found that if the employer's communications in connection to an union organizational drive rise to the level of a "a threat of retaliation based on misrepresentation and coercion," the communication will be "without the protection of the First Amendment*." N. L. R. B. v. Gissel Packing Co.*, 395 U.S. 575, 617-18 (1969). Thus, while an employer is free to communicate "what he reasonably believes will be the likely economic consequences of unionization that are outside his control," the employer may not communicate "threats of economic reprisal to be taken solely on his own volition." *Id.* at 619. In light of the First Amendment's protections, an employer's communications cannot be "evidence of an unfair labor practice, so long as such expression contains no threat of reprisal or force or promise of benefit in violation of [the National Labor Relations Act]," but a statute may still "prohibit[] interference, restraint, or coercion of employees" exercising "their right to self-organization." *Id.* at 617 (internal quotation marks omitted).

In light of these decisions, and in light of DZNPS's failure to cite any authorities directly on point, where the First Amendment has been applied to preclude a finding of retaliation or interference under the ADA or other employment discrimination statute, then if the Letter is retaliation or interference prohibited by the ADA, then it will also falls outside the scope of the First Amendment's protections, just as "interference, restraint, or coercion of employees" exercising "their right to self-organization," are not protected by the First Amendment. *Gissel Packing*, 395 U.S. at 617.

### b. First Amendment and Restrictions on Employer Communications in Class Actions

DZNPS also points to a line of cases based on First Amendment concerns and a court's ability to limit communications in the early stages of a class action. For the reasons below, the Court finds that these cases do not preclude a finding that DZNPS's Letter amounts to retaliation or interference in violation of the ADA.

The Supreme Court has recognized that, out of concern for the First Amendment, courts cannot freely impose "serious restraints on expression" on parties in connection with their prosecution of a class action. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 104 (1981) (discussing case where district court had barred communications by plaintiffs of putative employment discrimination class action to potential class members). These First Amendment concerns "counsel[] caution on the part of a district court," in drafting orders that limit such communications related to class actions, "and attention to whether the restraint is justified by a likelihood of serious abuses." *Id.* Because "the mere possibility of abuses does not justify routine adoption of a communications ban that interferes with the formation of a class or the prosecution of a class," the Court may only impose sweeping restrictions on a class action party's ability to communicate with potential class members based on "a clear record and specific findings of need" for such a restriction. *Id.* at 104 (analyzing court's ability to exercise its discretion under Fed. R. Civ. P. 23).

Following *Gulf Oil*, courts in this Circuit recognize that, "[d]istrict courts . . . must not interfere with any party's ability to communicate freely with putative class members, unless there is a specific reason to believe that such interference is necessary." *Austen v. Catterton Partners V, LP*, 831 F. Supp. 2d 559, 567 (D. Conn. 2011) (emphasis removed). Thus, in cases where "parties engaged in serious abuses such as giving false, misleading, or intimidating information,

concealing material information, or attempting to influence the decision about whether to seek exclusion from a class," the court may impose more pronounced restrictions on the parties. *Id.* at 568 (internal quotation marks omitted). Even in cases "where neither party has engaged in misconduct," however, there may still be "good reasons to impose [only] limited restrictions on both parties' abilities to communicate with putative class members." *Id.* at 570.

A court has found that a letter from plaintiffs' counsel in a putative class action that "(1) informs [potential class members] about the existence of Plaintiff's lawsuit, (2) briefly describes the claims alleged, (3) states that Plaintiff's counsel is currently investigating Plaintiff's claims by speaking with other [potential class members] to determine if they have any information that supports Plaintiff's claims, and (4) states that recipients may feel free to contact Plaintiff's counsel if they have any information regarding any of the violations that Plaintiff alleges[defendant employer] committed as mentioned in this letter," did not require court intervention because there was "nothing inherently intrusive or misleading about the communication" and it "appear[ed] to be squarely aimed at obtaining information which may be relevant to . . . [the] claims and discovery in this action." *Mendez v. Enecon Ne. Applied Polymer Sys., Inc.*, No. CV 14-6736 (ADS) (AKT), 2015 WL 4249219, at *2 (E.D.N.Y. July 13, 2015) (internal quotation marks omitted).

Courts have, however, also recognized that an employer's "workplace relationship with current employees, and their knowledge of sensitive information about current and former employees, put them in a position to exercise strong coercion in connection with potential class members' decisions regarding participation in this litigation," and in circumstances where evidence is "sufficiently suggestive of actual interference by Defendants with the rights of potential class members to receive advice and consider whether to assert claims," then "carefully

tailored, limited restriction on Defendants' right to communicate directly with current and former employees who are potential class members regarding" the case are warranted. *Urtubia v. B.A. Victory Corp.*, 857 F. Supp. 2d 476, 485 (S.D.N.Y. 2012); *see also E.E.O.C. v. Morgan Stanley & Co.*, 206 F. Supp. 2d 559, 562 (S.D.N.Y. 2002), *adopted by*, 2002 WL 1431685 (S.D.N.Y. July 1, 2002). ("Courts have found the danger of such coercion between employers and employees sufficient to warrant the imposition of restrictions regarding communication between defendants and potential class members.")

Because, under the *Gulf Oil* line of cases, courts may restrict employer communications to potential class action class members out of concerns of "actual interference by Defendants with the rights of potential class members," *Urtubia*, 857 F. Supp. 2d at 485, the Court finds that these cases do not preclude this Court from a finding that the Letter violated the ADA. The EEOC's Complaint alleges that the Letter both (a) interfered with the rights of Mr. Marsh and the Letter recipients to exercise rights under the ADA and (b) that it amounted to illegal retaliation against Mr. Marsh for filing his EEOC charge. The *Gulf Oil* line of cases does not prevent courts from imposing restrictions on employer communications in situations where those communications could amount to "coercion" or prevent employees from exercising their rights. *See Morgan Stanley*, 206 F. Supp. 2d at 562. Thus, the *Gulf Oil* decision does not prevent this Court from finding that the Letter constituted interference or retaliation under the ADA.

### 3. Litigation Privilege

DZNPS also argues that its sending of the Letter is protected by the litigation privilege under Connecticut law. Def,'s Br. at 18-19. Specifically, DZNPS argues that it sent out the Letter in the context of an ongoing quasi-judicial proceeding before the EEOC, that the Letter

concerned the subject matter of the EEOC's investigation of Mr. Marsh's disability discrimination charge, and that DZNPS sent the Letter only to potential witnesses. *Id.* at 19.

As an initial matter, the Court finds that the Supremacy Clause of the United States Constitution likely prevents DZNPS from prevailing on its argument that Connecticut's common law litigation privilege protects it from liability under the ADA, a federal statute. The Supreme Court has explained, for instance, that in the context of lawsuits under 42 U.S.C. § 1983, "[a] construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise," citing the Supremacy Clause. *See Martinez v. State of Cal.*, 444 U.S. 277, 284 n. 8 (1980). Thus, courts in other circuits have found that the litigation privilege under state law does not protect parties from liability in lawsuits brought under federal statutes, including employment discrimination statutes such as the ADA or Title VII. *See Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 851 (9th Cir. 2004) (explaining in a ADA retaliation case that "[a] state absolute litigation privilege purporting to confer immunity from suit cannot defeat a federal cause of action"); *Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1998) (refusing to apply Illinois litigation privilege to bar ADA and Title VII claims); *Kimes v. Stone*, 84 F.3d 1121, 1127 (9th Cir. 1996) ("The litigation immunity provided in Cal. Civ. Code § 47(b) does not apply to [plaintiff's] § 1983 cause of action."). Nevertheless, in the absence of Second Circuit authority on this issue, and as explained below, the Court also finds that Connecticut's litigation privilege would not preclude the EEOC's ADA claims in this case, even in the absence of Supremacy Clause concerns.

Under Connecticut law, a rule of "absolute immunity," or "the litigation privilege" protects the statements or actions that any individual makes, in the context of a judicial proceeding, from giving rise to most tort claims. *MacDermid, Inc. v. Leonetti*, 310 Conn. 616,

23

627 (2013).  "[The] purpose of affording absolute immunity to those who provide information in connection with judicial and quasi-judicial proceedings is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege . . . [p]ut simply, absolute immunity furthers the public policy of encouraging participation and candor in judicial and quasi-judicial proceedings."  *Id.* at 627-28.  "As a result, courts have recognized absolute immunity as a defense in certain retaliatory civil actions in order to remove this disincentive" to participate in judicial proceedings.  *Id.*

The rule protects individuals from claims of defamation, "intentional interference with contractual or beneficial relations," "intentional infliction of emotional distress," and "retaliatory claims of fraud against attorneys for their actions during litigation."  *Leonetti*, 310 Conn. at 628. Generally, the rule "ensure[s] that the conduct that absolute immunity is intended to protect, namely, participation and candor in judicial proceedings, remains protected regardless of the particular tort alleged," and "because the privilege protects the communication, the nature of the theory on which the challenge is based is irrelevant."  *Id.* (emphasis removed).

This rule applies to both judicial proceedings and those that are quasi judicial in nature. *See Kelley v. Bonney*, 221 Conn. 549, 565-66 (1992) ("Like the privilege which is generally applied to pertinent statements made in formal judicial proceedings, an absolute privilege also attaches to relevant statements made during administrative proceedings which are 'quasijudicial' in nature." (internal quotation marks omitted)); *see also D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 219 (E.D.N.Y. 2012) (discussing New York absolute privilege rule and noting that "statements made in quasi-judicial proceedings, including proceedings before agencies such as the EEOC, are protected by an absolute privilege").

Connecticut courts have found that this type of privilege may extend to communications beyond the works "spoken in open court or contained in a pleading, brief, or affidavit." *McManus v. Sweeney*, 78 Conn. App. 327, 335 (2003). "In instances where communications are made to alleged potential witnesses, the court must particularly evaluate the factual circumstances peculiar to each case to determine whether application of absolute privilege is warranted." *Kelley*, 221 Conn. at 573 (internal quotation marks omitted). If communications are "conducted for the purpose of marshaling evidence" in connection with a proceeding or quasi-judicial proceeding, there can be "factual circumstances" that allow the communications to be "absolutely privileged." *Id.* at 574.

DZNPS points to no authority where any court found that claims for violations of federal employment discrimination laws were precluded by Connecticut or another state's absolute immunity or litigation privilege rules. Connecticut courts have applied the litigation privilege rule only in contexts where a plaintiff brings tort claims, including those for defamation, intentional infliction of emotional distress, and fraud. *See Leonetti*, 310 Conn. at 627-28 (noting that the rule protects "participation and candor in judicial proceedings," "regardless of the particular tort alleged"). Here, the EEOC has brought claims against DZNPS for the alleged violation of the ADA's prohibitions on retaliating against an employee for exercising their rights under the ADA and for interfering with Mr. Marsh and other employees' potentially exercising rights under the ADA, which are not tort claims. The Court therefore finds that DZNPS is not entitled to summary judgment on litigation privilege grounds, as the litigation privilege does not apply to the EEOC's claims.

Furthermore, this Court (Kravitz, J.) has found that a letter from an employer to a large group of employees regarding a pending litigation is not protected by Connecticut's litigation

privilege, at least at the summary judgment stage, where there was a genuine dispute of material fact as to whether the letter was geared towards "the fact-finding function of the court and the interest in having witnesses speak freely," or whether it was "primarily (if not exclusively) aimed at discrediting [plaintiff's] allegations." *Wolinsky v. Standard Oil of Connecticut, Inc.*, 712 F. Supp. 2d 46, 58, 61-62 (D. Conn. 2010) (discussing case where the letter sent by defendant stated in relevant part that "[defendants] will not submit to extortion" and the court rejected defendants' argument that the letter was "communicated to potential witnesses: all of [defendant's] employees" in part because defendant could not "substantiate[] its claim that everyone to whom it published the statement was actually a potential witness" and there was therefore a factual dispute as to whether "distribution of the statement was unnecessarily broad"). Thus, even in the absence of Supremacy Clause concerns, the Court finds that, as a matter of law, Connecticut's litigation privilege does not protect DZNPS from ADA liability for sending the Letter.

**B.   ADA Retaliation**

Section 503(a) of the ADA provides that: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

ADA retaliation claims are subject to the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "first, the plaintiff must make a prima facie showing of retaliation; then, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action; lastly, the plaintiff must provide evidence demonstrating that the proffered reason is merely a pretext for discrimination."

*Shepheard v. New York City Corr. Dep't*, 360 F. App'x 249, 251 (2d Cir. 2010) (summary order); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002) ("Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." (internal quotation marks omitted)).

To make out a prima facie case of retaliation under the ADA, the plaintiff must show the following elements: "(1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 177 (2d Cir. 2006). The fourth prong, of a causal connection, requires that a plaintiff show that "a retaliatory motive played a part in the adverse employment action." *Sista*, 445 F.3d at 177.

The parties do not dispute that Mr. Marsh engaged in protected activity by filing an EEOC charge and that DZNPS was aware of Mr. Marsh's protected activity. DZNPS argues that there is no genuine dispute of material fact that the EEOC will not be able to establish the third and fourth prongs of the prima facie case of retaliation under the ADA, either an adverse employment action or a causal connection between the protected activity and the adverse employment action. Def.'s Br. at 21-24. DZNPS also argues that, even if the EEOC has shown a genuine dispute of material fact as to the prima facie case for retaliation, the EEOC has not

rebutted DZNPS's legitimate non-retaliatory reasons for sending the Letter. *Id.* at 24-28. The Court considers each of these arguments in turn.

### 1. Adverse Employment Action

In its previous order denying DZNPS's motion to dismiss, ECF No. 33, this Court found that it could not "conclude as a matter of law that the [Letter] does not constitute an adverse employment action." *Equal Employment Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*, No. 15-CV-01416 (VAB), 2016 WL 1449543, at *3 (D. Conn. Apr. 12, 2016). In making this determination, this Court noted that, to determine whether something "could be found to constitute an adverse employment action" for purposes of an ADA retaliation claim, "the key inquiry is whether the effect of defendants' decision was materially adverse." *Ragusa v. Malverne Union Free Sch. Dist.*, 381 Fed.Appx. 85, 90 (2d Cir. 2010). "'[A]dverse actions' in the retaliation context are defined more broadly than in the discrimination context. For an allegedly retaliatory action to be materially adverse, the plaintiff must show that the action 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Lewis v. Boehringer Ingelheim Pharm., Inc.*, 79 F. Supp. 3d 394, 413 (D. Conn. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Furthermore, "some actions may take on more or less significance depending on the context." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011). This Court also noted that many courts have held that "when an employer disseminates an employee's administrative charge of discrimination to the employee's colleagues, a reasonable factfinder could determine that such conduct constitutes an adverse employment action." *See Day & Zimmerman*, 2016 WL 1449543 at *3 (gathering cases).

"The law of the case doctrine commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (internal quotation marks omitted). This doctrine "does not rigidly bind a court to its former decisions, but is only addressed to its good sense." *Id.* at 99. Courts "may depart from the law of the case for cogent or compelling reasons including an intervening change in law, availability of new evidence, or the need to correct a clear error or prevent manifest injustice. *Id.* at 99-100 (internal quotation marks omitted).

DZNPS does not point to any intervening change in the relevant law or any other "cogent and compelling reasons," *Johnson*, 564 F.3d at 99, for this Court to disturb its previous finding that the Letter could, as a matter of law, be an adverse employment action to make out a prima facie case for retaliation under the ADA. DZNPS points to a case suggesting that, where a plaintiff employee "had not been [d]efendants' employee for more than a year" by the time of the complained about action, "[d]efendants lacked control over any aspect of [plaintiff's] working conditions" and plaintiff "d[id] not identify any aspect of her working conditions that changed after" the complained about action, which meant that it "did not constitute adverse employment action." *Marchuk v. Faruqi & Faruqi, LLP*, 100 F. Supp. 3d 302, 311 (S.D.N.Y. 2015) (discussing Title VII retaliation case). As explained below, however, this case is inapplicable here, particularly in light of Second Circuit authority indicating that adverse employment actions that could amount to Title VII retaliation should be interpreted more broadly.

The Second Circuit has ruled that, in the Title VII context, "anti-retaliation protection is broader and extends beyond workplace-related or employment-related retaliatory acts and harm," and that previous decisions "limit[ing] unlawful retaliation to actions that affect the terms and

conditions of employment, no longer represent the state of the law." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks omitted). Furthermore, Title VII protects former employees, as well as current employees. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (holding that "former employees are included" within Title VII protections). The Court, therefore, looks to its previous finding that "when an employer disseminates an employee's administrative charge of discrimination to the employee's colleagues, a reasonable factfinder could determine that such conduct constitutes an adverse employment action." *Day & Zimmerman*, 2016 WL 1449543 at *3.

Furthermore, Mr. Marsh has testified that, since the Letter was sent, he is now being laid off from his new jobs first, see Def.'s 56(a)(1) ¶ 78, and that when DZNPS posts jobs with his union locals, he is not referred to these jobs, though he does not know the reason. Marsh Dep. 92:6-93:23, ECF No.75-1. The Court, consistent with the previous Order denying DZNPS's motion to dismiss, finds that a reasonable jury could find that the Letter was an adverse employment action.

### 2.      Causal Connection Between Protected Activity and Adverse Action

The Court's previous order noted that DZNPS sent the Letter three months after the EEOC requested the names and contact information of the other electricians that worked for DZNPS at Millstone in the fall of 2012, seventeen months after Mr. Marsh filed the EEOC charge. This Court noted that the period between the initial administrative filing and the alleged adverse employment action "is not the only relevant timeframe." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015) (noting that employer "did not become aware of the EEOC's intention to seriously pursue [plaintiff's] claim until ... the agency informed [the employer] it would be taking interviews," and "[t]hus, a reasonable jury could find that

[employer] decided to retaliate against [employee] not when she filed her charge, but when [employer] saw that the EEOC was taking the charge seriously"). This Court also noted that courts have found a three-month gap to provide sufficient temporal proximity to satisfy the causation prong. *See, e.g., id.* (finding three months to be "suspicious timing"); *Hopkins v. Bridgeport Bd. of Educ.*, 834 F. Supp. 2d 58, 67 (D. Conn. 2011) ("three month period could allow for an inference of causation" in retaliation claim). The Second Circuit has specifically found that even "five months is not too long to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

As the EEOC argues, it can also present more than temporal proximity between the EEOC's request for the electricians' contact information and the sending of the Letter to support a jury's inference that there was a causal connection between Mr. Marsh's protected activity and the Letter. Pl.'s Opp. at 18-19, ECF No. 85; *see also Howard v. City of New York*, 602 F. App'x 545, 549 (2d Cir. 2015) ("A plaintiff can establish the causal connection between protected expression and an adverse employment determination indirectly by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.") (summary order). The Letter itself clearly refers to Mr. Marsh's charge and the EEOC's investigation, and is clearly a response to those things. The Court therefore finds that a reasonable jury could find that the EEOC has shown a causal connection between Mr. Marsh's protected activity and DZNPS sending the Letter, and that "a retaliatory motive played a part" in the sending of the Letter. *Sista*, 445 F.3d at 177.

### 3. Rebuttal of Legitimate Nondiscriminatory Reason

DZNPS also argues that it is entitled to summary judgment on the EEOC's retaliation claim because the EEOC cannot rebut the EEOC's proffered legitimate non-discriminatory, non-

retaliatory reason for sending the Letter, that it was sent to prevent business disruption and efficiently inform the Letter recipients that DZNPS would be producing their contact information to the EEOC. Def.'s Br. at 24-26. DZNPS specifically points to what it views as the EEOC's inability to present any of its own evidence to rebut Ms. Cooney's testimony regarding DZNPS's legitimate, non-discriminatory reason for sending the Letter. *Id.* at 27-28.

After the plaintiff makes out their prima facie case of retaliation under the ADA, the defendant must "articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Treglia*, 313 F.3d at 721. "[A]ny legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case." *Johnson v. Connecticut Dep't of Admin. Servs.*, 972 F. Supp. 2d 223, 252 (D. Conn. 2013), *aff'd*, 588 F. App'x 71 (2d Cir. 2015). "The defendant is not required to prove that the articulated reason actually motivated its actions." *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). DZNPS has met the burden of providing evidence of a legitimate non-discriminatory reason by arguing that it sent the letter to notify the Letter recipients that DZNPS had provided their contact information to the EEOC and presenting Ms. Cooney's testimony to that effect. The parties dispute whether the EEOC has "point[ed] to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation" under the third step of the *McDonnell-Douglas* burden shifting framework. *Treglia*, 313 F.3d at 721.

It is well established that "[a] plaintiff may prove retaliation by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016) (discussing FMLA retaliation claim)

(internal quotation marks omitted); *see also Treglia*, 313 F.3d at 721 (finding that "viewing the [defendant's] evidence in the light most favorable to the plaintiff . . . a reasonable jury could find that the non-retaliatory reasons given by [defendant] were pretextual explanations meant to hide its unlawful motive") (discussing ADA retaliation claim); *Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 90 (2d Cir. 2010) (finding that the "record is sufficient to raise a question of pretext" regarding employer's action because of discrepancies between "defendants' proffered rationale" and the facts) (summary order); *Infantolino v. Joint Indus. Bd. of Elec. Indus.*, 582 F. Supp. 2d 351, 361 (E.D.N.Y. 2008) (finding that "inconsistencies in [individual co-defendant's] testimony could lead a reasonable juror to infer" that defendant employer's legitimate non-discriminatory reason "that it was following a well-established protocol" was pretextual because "a reasonable juror [could] infer that the protocol was not well established or that [defendant employer] was not following it").

The EEOC points to several discrepancies with DZNPS's proffered legitimate non-discriminatory reason for sending the Letter, from which "a reasonable jury could conclude that the explanation[] [was] a pretext" for retaliation. *Graziadio*, 817 F.3d at 430. For instance, Ms. Cooney testified that DZNPS would not have sent the Letter, if the business agent of IBEW Local 90 did not consent to the sending of the Letter. Cooney Dep. 86:20-87:23, Def.'s 56(a)(1) Ex. A. The e-mail that DZNPS sent to the business agent of IBEW Local 90, through another employee named Brian Roach, indicated, however, that:

> The letter is in draft, we would like your feedback as well as to give advance notice of this situation so that you can also provide a heads up to your members who may be contacted. We would appreciate your comments and acknowledgement of our intent to send this letter as soon as possible as the EEOC has put us under a relatively tight schedule.

Local 90 Email at 1, Def.'s 56(a)(1) Ex. T, ECF No. 75-2. The phrasing of the e-mail, particularly DZNPS's request for an "acknowledge of our intent to send this letter," could cause a reasonable jury to infer that DZNPS would accept the business agent's feedback, but not necessarily allow them to reject the Letter in its entirety. This discrepancy could allow a reasonable jury to infer that part of DZNPS's explanation is implausible or inconsistent, and therefore pretextual. Furthermore, Ms. Cooney's own testimony indicated that no union business agent had ever rejected DZNPS sending a similar letter, suggesting that the consent of the union may not have played a significant role in DZNPS's decision-making process. Cooney Dep. 87:3-4, Def.'s 56(a)(1) Ex. A.

Additionally, while DZNPS's proffered legitimate, non-discriminatory reason for sending the Letter is to "minimize business disruption" and notify the recipients that DZNPS had disclosed their "home telephone numbers and addresses . . . to the EEOC," Def.'s Br. at 25, a reasonable jury could review the Letter and find that DZNPS's explanation is pretextual. If the Letter had been solely intended to minimize business disruption and inform the recipients about the disclosure of their contact information to the EEOC, the letter need not include an entire paragraph identifying Mr. Marsh, discuss the nature and subject matter of Mr. Marsh's charge, nor disclose the specific accommodations he sought, that "his doctor told him he could not work in an area that had radiation . . . chemicals or exposure." Letter at 1.

A reasonable jury could also conclude that DZNPS's explanation was pretextual because the Letter did not need to explain that recipients need not speak to the EEOC investigator and that "counsel for DZNPS" could be present if the recipient chose to speak to the EEOC. Letter at 1. These details could all "demonstrate[e] weaknesses, implausibilities, inconsistences, or contradictions" to DZNPS's "proffered legitimate, nonretaliatory reasons" for sending the Letter

and allow a reasonable jury to find that the explanation is pretextual. *Graziadio*, 817 F.3d at 430. DZNPS is therefore not entitled to summary judgment on the EEOC's ADA retaliation claim.

### C. ADA Interference

The EEOC moves for summary judgment in its favor on its ADA interference claim arguing that the Court can find, as a matter of law, that DZNPS interfered with the rights under the ADA of Mr. Marsh and all the Letter recipients because a reasonable jury would need to conclude that the Letter had a tendency to chill recipients from exercising their rights under the ADA. *See* Pl.'s Br. at 6-21, ECF No. 70. DZNPS also moves for summary judgment in its favor as to the ADA interference claim, arguing that no reasonable jury could find that the Letter constituted unlawful interference under the ADA. *See* Def.'s Br. at 28-31. The Court disagrees with both parties and finds summary judgment inappropriate for either side.

Section 503(b) of the ADA prohibits interferences by providing that:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b). Neither the Supreme Court nor the Second Circuit has yet outlined a legal test for an interference claim under the ADA. The Second Circuit has, in at least one case, allowed an ADA interference claim to proceed, without analysis, in conjunction with an ADA retaliation claim that it found was sufficiently supported to survive a motion for summary judgment. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223-24 (2d Cir. 2001) (holding that both ADA retaliation and interference claims survived summary judgment in case where defendant's letter responding to plaintiff's request for ADA accommodations stated that

"if [plaintiff] continued this behavior, [defendant] would have no choice but to address [her] behavior through legal channels" and that defendant "not be entertaining further communication on the matter" which a reasonable jury could conclude did "intimidate or threaten" plaintiff "in the assertion of her right to make complaints or file charges under the ADA" (internal quotation marks omitted)).

As one court noted, "[c]ase law interpreting § 503(b) is sparse," but "[t]he plain words of the statute, however, preclude a party from intimidating or coercing another party not to exercise his rights under the ADA, as well as barring interference against a person who has exercised his rights under the ADA." *Breimhorst v. Educ. Testing Serv.*, No. 99-cv-3387, 2000 WL 34510621, at *7 (N.D. Cal. Mar. 27, 2000). The Third Circuit and Ninth Circuit have found that that Section 503(b) "arguably sweeps more broadly than" Section 503(a). *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 789 (3d Cir. 1998); *see also Brown v. City of Tucson*, 336 F.3d 1181, 1192 (9th Cir. 2003) (finding that "the ADA's interference provision . . . protects a broader class of persons against less clearly defined wrongs" than its anti-retaliation provision).

Other courts have found that the interference provision of the ADA, unlike the retaliation provision, "does not expressly limit a cause of action to the particular employee that engaged in protected activity." *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 570 (3d Cir. 2002). The interference provision provides that employers may not "interfere with any individual" in their exercise of rights under the ADA or even in their "aid[ing] or encourage[ing] any other individual in the exercise or enjoyment of" any right under the ADA. 42 U.S.C. § 12203(b). Furthermore, "action taken against the third party employee can have the effect of coercing the employee engaging in protected activity, and may also coerce other employees of the company from engaging in protected activity in the future." *Fogleman*, 283 F.3d at 571. Even in the

retaliation context, courts have found that the ADA's protections apply even to non-disabled employees. *See Munck v. New Haven Sav. Bank*, 251 F. Supp. 2d 1078, 1087 (D. Conn. 2003) ("Several courts have held that a non-disabled employee is nonetheless protected against retaliation if the employee made a good faith request for a reasonable accommodation."); *see also Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010) ("The fact that [plaintiff] is not disabled under the ADA is not fatal to his retaliation claim.").

Additionally, courts have noted that the ADA's anti-interference provision is similar to a provision in the National Labor Relations Act, 29 U.S.C. § 158 (the "NLRA"), and that "interpretations of the NLRA can serve as a useful guide to interpreting similar language in the ADA, as both are 'part of a wider statutory scheme to protect employees in the workplace nationwide.'" *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 570 (3d Cir. 2002) (quoting *McKennon v. Nashville Banner Pub'g Co.*, 513 U.S. 352, 357 (1995)). In the context of the analogous NLRA[7] provision, the Supreme Court observed that "the economic dependence of the employees on their employers" creates a "necessary tendency of the former . . . to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Gissel*, 395 U.S. at 617-18. As a result, the Court held that, in *Gissel*, it was reasonable to conclude "that the intended and understood import of [the employer's] message was not to predict that unionization would inevitably cause the plant to close but to threaten to throw employees out of work regardless of the economic realities." *Id.* at 619.

The Second Circuit has found that an employer's conduct violates the NLRA's prohibition on interference "if, under all the existing circumstances, the conduct has a reasonable

---

[7] The analogous provision of the NLRA provides that "It shall be an unfair labor practice for an employer . . . (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [29 U.S.C. § 157]." 29 U.S.C. § 158(a).

tendency to coerce or intimidate employees, regardless of whether they are actually coerced."

*New York Univ. Med. Ctr. v. N.L.R.B.*, 156 F.3d 405, 410 (2d Cir. 1998); *see also Three D, LLC

v. N.L.R.B.*, 629 F. App'x 33, 38 (2d Cir. 2015) (noting that something "violates [the NLRA's

interference provision] if it would reasonably tend to chill employees in the exercise of their

[NLRA rights]") (summary order). This is an objective test that does not turn on whether any of

the affected employees were actually deterred from exercising their rights.[8] While evidence of

the subjective impact of the Letter on its recipients is relevant, *see Jantz v. Emblem Health*, No.

10 CIV. 6076 PKC, 2012 WL 370297, at *15 (S.D.N.Y. Feb. 6, 2012) ("The Second Circuit has

instructed that while the test is an objective, it remains relevant whether the plaintiff himself was

deterred from complaining." (discussing test for adverse employment action in context of Title

VII retaliation claim)), such evidence will not, therefore, be dispositive on the question of

whether the Letter represented unlawful interference under the ADA.

In analyzing NLRA interference claims, courts, including the Second Circuit, have also

concluded that the employer need not have an impermissible motive to be found liable of

unlawful interference. *See N. L. R. B. v. Burnup & Sims, Inc.*, 379 U.S. 21, 22-23 (1964) ("[W]e

are of the view that in the context of this record [the NLRA interference provision] was plainly

violated, whatever the employer's motive . . . . Defeat of [employees' rights] by employer action

does not necessarily depend on the existence of an anti-union bias."); *Welch Sci. Co. v. N. L. R.

B.*, 340 F.2d 199, 203 (2d Cir. 1965) ("[W]e conclude that, if the conduct complained of

otherwise violated [the NLRA interference provision], good faith is no defense. The cases

clearly demonstrate that it is the tendency of an employer's conduct to interfere with the rights of

---

[8] DZNPS argues that the subjective effect of the letter should be taken into account, but cites only cases discussing
retaliation claims in support of this proposition. *See* Def.'s Opp. at 2-3, ECF No. 85. The interference provision
"protects a broader class of persons against less clearly defined wrongs" than the retaliation provision. *Brown*, 336
F.3d at 1192.

his employees protected by [the NLRA interference provision], rather than his motives, that is controlling.").

As the Court explained in its previous order denying DZNPS's motion to dismiss, ECF No. 33, the disclosure of sensitive personal information about an individual could well dissuade that individual from making or supporting a charge of discrimination under the ADA. The Court now finds that a reasonable jury could conclude that the letter could have the effect of interfering with or intimidating the Letter's recipients with respect to communicating with the EEOC about possible disability discrimination by DZNPS.

DZNPS argues that evidence of improper motive on its part, an actual threat of reprisal in the Letter, or of employees actually being deterred by the Letter from exercising their ADA rights, should be required in order for the EEOC's interference claim to proceed to trial, *see* Def.'s Opp. at 5-8; Def.'s Br. at 28-30, but for the reasons explained above, the Court does not adopt DZNPS's arguments. Instead, the Court finds that "if, under all the existing circumstances, [DZNPS's] conduct has a reasonable tendency to coerce or intimidate employees, regardless of whether they are actually coerced," then DZNPS would be liable for interference under the ADA. *New York Univ.*, 156 F.3d at 410. Because the Court finds that the question of whether the Letter had a reasonable tendency to coerce or intimidate the recipients from exercising their rights under the ADA is one that should be reserved for the jury, the Court also declines to find, as a matter of law, that the EEOC is entitled to summary judgment on its interference claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** the EEOC's motion for partial summary judgment, ECF No. 69, and also **DENIES** DZNPS's motion for summary judgment, ECF No.

73. This case will therefore proceed to trial on both the EEOC's ADA retaliation claim and the ADA interference claim.

SO ORDERED at Bridgeport, Connecticut, this 22nd day of August, 2017.

/s/ Victor A. Bolden  
Victor A. Bolden  
United States District Judge
